UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MEHTAP ARGUN,

    Plaintiff,

v.

NEIMAN MARCUS GROUP, INC.,
ELISA RUGGIERO, and JOHN DOES
1-20,

    Defendants.

Civ. No. 19-14548 (KM) (MAH)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Mehtap Argun worked at a Neiman Marcus store for over a decade before her employment ended in 2018. She sued the company and her managers, alleging she was terminated on the basis of ethnic/religious or disability discrimination.

Now before the Court is the motion of The Neiman Marcus Group LLC[1] and Elisa Ruggiero, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to compel arbitration and to dismiss or stay the action in favor of arbitration. (DE 8).[2] For the following reasons, the motion is **GRANTED**.

### I. FACTS

#### A. The Parties

The plaintiff, Mehtap Argun, is a resident of New Jersey. (DE 1 ¶ 7). Defendant The Neiman Marcus Group LLC is a Delaware limited liability

---

[1] Argun identified as the defendant "Neiman Marcus Group, Inc." In fact, her employer was "The Neiman Marcus Group LLC." The arbitration agreements she signed govern claims against The Neiman Marcus Group, Inc. and its subsidiaries and divisions, which includes The Neiman Marcus Group LLC.

[2] "DE __" refers to the docket entries in this case. "Compl. __" refers to the allegations in the complaint, which is attached as Exhibit A to DE 1, the notice of removal.

company whose ultimate parent is Neiman Marcus Group, Inc., a Delaware corporation headquartered in Texas. (DE 1 ¶ 7). Defendant Elisa Ruggiero is a resident of New York.³ (DE 1 ¶ 7).

**B. The Dispute**

The complaint presents a variety of allegations, but I focus here on those relevant to the motion.

In October 2006, Argun began working as a beauty ambassador at the Neiman Marcus store in Paramus, New Jersey. (Compl. ¶ 9). In that role, she promoted the sale of certain cosmetics, chiefly the brand Laura Mercier. (Compl. ¶ 10). Argun, a Muslim, alleges that despite her success and productivity, Neiman Marcus repeatedly refused to promote her and instead promoted less-qualified non-Muslim employees. (Compl. ¶¶ 12–14). During Argun's time at Neiman Marcus, Ruggiero was her manager. (Compl. ¶ 47).

Between 2014 and 2018, Argun suffered a series of work-related injuries that required her to take time off under the Family and Medical Leave Act. (Compl. ¶¶ 18–31). Argun filed for workers' compensation benefits, but Neiman Marcus contested the claim. (Compl. ¶¶ 28 & 29). The parties settled their administrative dispute, but Neiman Marcus terminated Argun's employment a month later. (Compl. ¶¶ 33 & 34). According to Neiman Marcus, waning sales of Argun's assigned brand, Laura Mercier, required it to downsize, but Argun believes this excuse is a pretext for the company's intentional discrimination. (Compl. ¶¶ 35 & 36).

Argun filed this lawsuit about a year later. (Compl. at 1.) In response to the complaint, defendants filed a motion seeking to dismiss the action and to compel Argun to submit her claims to binding arbitration. (DE 8).

---

3     For purposes of this motion, Neiman Marcus and Ruggiero stand in the same position, because the arbitration agreements that are the subject of this motion provide that "the term 'Company' includes NMG as well as its divisions, subsidiaries, and affiliated entities, all former, current, and future officers, directors, and employees of all such entities, all benefit plans and their fiduciaries and administrators related to the Company, and all successors and assigns of these individuals or entities." (DE 8-2 Ex. G ¶ 1).

## C. The 2007 & 2008 Arbitration Agreements and Associate Handbooks

In 2007, Nieman Marcus implemented a policy that mandated that its employees agree to arbitrate with the company all work-related disputes. (DE 8-2 Ex. A). The agreement provides:

> THIS MANDATORY ARBITRATION AGREEMENT REQUIRES YOU TO SUBMIT ALL COMPLAINTS, DISPUTES, AND LEGAL CLAIMS ("DISPUTES") YOU HAVE AGAINST THE COMPANY, AND THE COMPANY TO SUBMIT ALL DISPUTES IT HAS AGAINST YOU, TO BINDING ARBITRATION. THE MANDATORY ARBITRATION AGREEMENT COVERS ALL DISPUTES, WHETHER THEY BE COMMON LAW, STATUTORY (SUCH AS STATE AND FEDERAL DISCRIMINATION CLAIMS), OR OTHERWISE – IN SHORT ANY DISPUTE.
>
> THE MANDATORY ARBITRATION AGREEMENT MEANS BOTH YOU AND THE COMPANY ARE WAIVING THE RIGHT TO A TRIAL BY JURY OR TO A TRIAL BEFORE A JUDGE IN A COURT OF LAW ON ALL DISPUTES. INSTEAD, ALL DISPUTES MUST BE SUBMITTED TO FINAL AND BINDING ARBITRATION.
>
> THE AGREEMENT FOR MANDATORY ARBITRATION IS NOT OPTIONAL. IT IS MANDATORY AND A CONDITION AND TERM OF YOUR EMPLOYMENT.

(DE 8-2 Ex. A). The agreement further provides that it encompasses all claims of "discrimination or harassment on the basis of . . . religion, national origin . . . disability, or any other unlawful basis" brought under "any [] federal or state discrimination statute . . . and state statutes and common law regulating employment termination," "personal injuries except those covered by workers' compensation," and "[r]etaliation for filing a protected claim for benefits (such as workers' compensation) or exercising rights under any statute." (DE 8-2 Ex. A ¶ 3). The agreement also provides that it can at any time, upon thirty days' notice, be amended, modified, or revoked. (DE 8-2 Ex. A ¶ 21).

At the same time that it provided Argun with the policy, Neiman Marcus also presented her with an acknowledgment form, which provides:

> By signing below, I acknowledge and affirm that:

3

> I have received and had an opportunity to review the NMG Mandatory Arbitration Agreement (the "Arbitration Agreement");
>
> I understand that the Arbitration Agreement is an **important legal document** that requires me to submit all complaints, disputes, and legal claims ("Disputes") I have against the Company, and the Company to submit **all Disputes** it has against me, to **binding arbitration**;
>
> I understand that the Arbitration Agreement means both I and the Company are **waiving the right to a trial by jury or to a trial before a judge** in a court of law on all Disputes. Instead, all Disputes must be submitted to final and binding arbitration;
>
> I understand that the Arbitration Agreement is **not optional**. Rather, it is **mandatory** and a condition and term of my employment if I am employed or continue employment on or after July 15, 2007.

(DE 8-2 Ex. D).

On June 27 and July 17, 2007,[4] Argun signed, in ink and with a handwritten signature, the arbitration agreement's acknowledgment form. (DE 8-2 Ex. D).

Later that year and again in 2008, Neiman Marcus provided Argun with copies of its employee handbook and accompanying acknowledgment forms. (DE 8-2 Ex. E). The handbooks describe the arbitration agreement, and they direct associates to the full text of the agreement. (DE 8-2 Ex. B at 2 & 5 & Ex. C at 2, 5 & 6). The handbook acknowledgment forms reads:

> By signing below, I acknowledge and affirm that:
>
> I have received and had an opportunity to review The NMG Binding Arbitration Program, which sets forth the terms and conditions of NMG's binding arbitration plan which provides that arbitration is the exclusive means of resolving any and all disputes or claims I or the Company may have against each other, arising out of or connected in any way with my employment with NMG, in lieu of a judge or jury trial. The Company has advised me that if I accept or

---

[4] It is not clear why Argun signed the acknowledgement twice, because the forms appear identical. (DE 8-2 Ex. D).

4

continue employment with the Company, I am deemed to have accepted the Binding Arbitration Program.

(DE 8-2 Ex. E).

On November 15, 2007 and September 22, 2008, Argun signed—again in ink and with a handwritten signature—the two acknowledgment forms.[5] (DE 8-2 Ex. E).

### D. The 2013 Arbitration Agreement and Associate Handbook

In January 2013, Neiman Marcus updated and issued a new version of the arbitration agreement, which again requires that all disputes between Neiman Marcus and its associates "be resolved exclusively through binding arbitration in accordance with [its] terms, conditions, and procedures." (DE 8-2 Ex. G ¶ 1). The agreement also contains a waiver of the right to a judicial trial:

> **Waiver of Judicial Forum**. For all Disputes, the Company and Employee waive their right to trial by jury or before a judge in a court of law, including the right to initiate an opt-in or opt-out class, representative, or private attorney general action. All Disputes will be settled by binding arbitration on an individual basis, pursuant to the Federal Arbitration Act as administered by JAMS, a third[-]party alternative dispute resolution provider.

(DE 8-2 Ex. G ¶ 2). The agreement also makes clear that an employee's continued employment is conditioned on his or her acceptance of the agreement:

> THIS AGREEMENT FOR MANDATORY ARBITRATION IS NOT OPTIONAL. IT IS MANDATORY AND A CONDITION AND TERM OF YOUR EMPLOYMENT IF YOU ARE OR CONTINUE TO BE AN EMPLOYEE ON OR AFTER MARCH 1, 2013, WHICH IS THE EFFECTIVE DATE OF THIS AGREEMENT (THE 'EFFECTIVE DATE'), YOU ARE DEEMED TO HAVE ACCEPTED AND AGREED TO THE MANDATORY ARBITRATION AGREEMENT BY COMING TO WORK AFTER THAT DATE.

---

5     It appears from the record that the 2007 and 2008 acknowledgement forms correspond to two reversions of the employee handbook.

(DE 8-2 Ex. G). Moreover, the agreement clarifies that, even setting aside the actual electronic signature, an employee's continued employment manifests the employee's assent to the agreement: "Each Employee's employment or continued employment with the Company after the Effective Date constitutes assent, acceptance, consent, and consideration for this Agreement to arbitrate, both during the time of employment and after termination of employment." (DE 8-2 Ex. G at 1).

The agreement specifies that the disputes falling within its ambit include those "involving . . . (ii) an allegation that any adverse employment action was based on discrimination or harassment because of Employee's . . . disability, mental or physical handicap . . . or any other legally protected status arising under any federal, state or local law or regulation; (iii) claims related to, or arising out of, the employment relationship between Employee and NMG; and/or Employee's separation from employment with NMG, including but not limited to any termination, retaliation or constructive discharge claims." (DE 8-2 Ex. G ¶ 3).

The agreement provides that Neiman Marcus will bear the costs of arbitration. (DE 8-2 ¶ 9).

Neiman Marcus also presented Argun with an acknowledgement form that it asked her to review before electronically consenting to the arbitration agreement. The agreement states:

By clicking below, I acknowledge and affirm that:

**I have received and had an opportunity to review The NMG Mandatory Arbitration Agreement, which sets forth the terms and conditions of NMG's binding arbitration program which provides that arbitration is the exclusive means of resolving any and all disputes or claims I or the Company may have against each other, arising out of or connected in any way with my employment with NMG, in lieu of a judge or jury trial. <u>THE COMPANY HAS ADVISED ME THAT IF I ACCEPT OR CONTINUE EMPLOYMENT WITH THE COMPANY, I AM DEEMED TO HAVE ACCEPTED THE MANDATORY ARBITRATION PROGRAM</u>;**

> I understand that the Company reserves the right to update, amend or modify the Associate Handbook and the Dispute Resolution Plan at any time, **except that the Mandatory Arbitration Agreement may be modified or revoked on a prospective basis only and with thirty (30) days' advance written notice of the substance of any modification or revocation. Any modification or revocation to the Mandatory Arbitration Program will have no effect on any dispute that arose or accrued prior to the effective date of the modification or revocation.**

(DE 8-2 Ex. G at 5).

Neiman Marcus also issued a 2013 edition of its employee handbook. The handbook specifically references the arbitration agreement:

> This brief description of the Arbitration Agreement should be regarded as a general overview, and in the event of any conflict between this description and the Arbitration Agreement, the actual terms and conditions of the Arbitration Agreement shall control. Please understand that the Arbitration Agreement is mandatory, a condition of employment or continued employment, and requires both you and the Company to waive all rights to a trial by jury or to a trial before a judge in a court of law on all disputes.

(DE 8-2 Ex. H at 9). Neiman Marcus required that its employees acknowledge and affirmed certain conditions:

> I have received and had an opportunity to review The Neiman Marcus Group, Inc. ("NMG") Associate Handbook (which includes, among other things, important information regarding NMG's policies and procedures concerning my employment and the Company's expectations of me as an associate);
>
> I have received and had an opportunity to review the "NMG Dispute Resolution Plan" which contains the 4-Step process for dispute resolution which/the Company expects me to follow to resolve all disputes that may arise in the course of my work;
>
> **I have received and had an opportunity to review The NMG Binding Arbitration Program, which sets forth the terms and conditions of NMG's binding arbitration program which provides that arbitration is the exclusive means of resolving any and all disputes or claims I or the Company may have**

7

**against each other, arising out of or connected in any way with my employment with NMG, in lieu of a judge or jury trial. THE COMPANY HAS ADVISED ME THAT IF I ACCEPT OR CONTINUE EMPLOYMENT WITH THE COMPANY, I AM DEEMED TO HAVE ACCEPTED THE BINDING ARBITRATION PROGRAM;**

(DE 8-3 at 11).

### E. Neiman Marcus's Electronic Signature Process

Beginning in January 2013, Neiman Marcus began using an online platform to record employee compliance with its human-resources policies. (DE 8-2 ¶ 5). That month, it distributed to employees instructions for logging on to its intranet, NMGPS. (DE 8-2 ¶ 5).

Neiman Marcus had designed NMGPS to allow employees to electronically view, acknowledge receipt of, and sign documents. (DE 8-2 ¶ 5 & DE 8-3 ¶¶ 5–6). NMGPS allows associates to view trainings, access documents and sign documents electronically. (DE 8-3 ¶ 4). Using NMGPS, Neiman Marcus assigns so-called "courses" and "curriculums" to associates. (DE 8-3 ¶ 4). Courses include training on various topics such as Neiman Marcus policies, safety procedures, and job-specific training. (DE 8-3 ¶ 4). Curriculums consist of training courses and other tasks, like reviewing and signing mandatory employment documents and legal agreements. (DE 8-3 ¶ 4).

Shortly after Neiman Marcus distributed the revised 2013 arbitration agreement to associates, on January 10, 2013 it assigned to associates an electronic curriculum that required them to electronically sign the code of conduct, associate handbook, and arbitration agreement. (DE 8-3 ¶ 5). Neiman Marcus required that the curriculum be completed by February 22, 2013. (DE 8-3 ¶ 5). The curriculum allowed associates to once again see the code of conduct, associate handbook, and arbitration agreement before signing the acknowledgment forms corresponding to those documents. (DE 8-3 ¶ 7 & Ex. B). NMGPS also allowed associates to at any time log on to review any document, including the arbitration agreement. (DE 8-3 ¶ 7 & Ex. B).

Associates were given as much time as necessary to review and acknowledge the documents, and—apart from the February 22, 2013 deadline—Neiman Marcus imposed no restrictions on completion of the curriculum. (DE 8-3 ¶ 8).

### F. Argun Agreed to the 2013 Arbitration Agreement and Associate Handbook

On January 22, 2013, Argun signed into NMGPS using a unique sign-in number and a self-selected password and completed the curriculum. (DE 8-3 ¶ 11 & Ex. C). In the process, Argun electronically acknowledged that she had received the arbitration agreement by clicking a button labeled "Click here to acknowledge receipt of The Neiman Marcus Group, Inc. Mandatory Arbitration Agreement." (DE 8-3 ¶ 11 & pp. 17 & 23). On the same day, and through a similar process, Argun electronically acknowledged receipt of the 2013 version of the handbook. (DE 8-3 ¶ 11 & p. 21).

After agreeing to the terms of the 2013 arbitration agreement handbook, Argun worked at Neiman Marcus for over five years. (Compl. ¶ 34). She was fired on July 28, 2018. (Compl., ¶ 34).

### G. Procedural History

On June 2, 2019, Argun filed this lawsuit in New Jersey Superior Court, Essex County. (*See* Compl.). Argun sued Neiman Marcus Group, Inc., her manager Elisa Ruggiero, and several upper-level Neiman Marcus managers whom she identified as John Does 1–20. (Compl.).

Argun stated causes of action for: (1) disability discrimination; (2) retaliation for taking disability leave; (3) refusal/failure to accommodate disability; (4) retaliation for filing workers' compensation claim; (5) religious/ethnicity/national origin discrimination; (6) refusal to hire; (7) aiding and abetting; and (8) intentional infliction of emotional distress.

## II. DISCUSSION

Because this matter involves a controversy between citizens of different states and the amount in controversy is alleged to exceed the sum of $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. Federal procedural

law and New Jersey substantive law will apply. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

## A. Standard of Review on Motion to Compel Arbitration

This Circuit's case law has meandered somewhat in defining the proper standard of review of a motion to compel arbitration. The upshot, however, is fairly clear. Where the issue can be decided without extrinsic evidence, it will be, based on an application of the familiar Rule 12(b)(6) standard to the face of the pleadings. Failing that, however, the Court will permit discovery and decide the issue on a summary judgment standard, pursuant to Rule 56. If there is a genuine issue of fact, summary judgment will be denied and the issues will be tried. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013).

Section 4 of the FAA sets forth the procedure when a court is presented with a petition to compel arbitration. That section provides, in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement. . . be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4. Although a party may demand a jury trial when issues respecting arbitrability are "in issue," 9 U.S.C. § 4, "[a] party resisting arbitration . . . bears the burden of showing that he is entitled to a jury trial.'" *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) (citing *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992)). As when opposing a motion for summary judgment under Federal Rule of Civil Procedure 56, the party requesting a jury trial must "submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v.*

*Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995); *see also Stuart*, 85 F.3d at 983–84 (party must demonstrate a "genuine" issue); *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 888–89 (6th Cir. 2002).

Federal law is decidedly pro-arbitration. The FAA's purpose is "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). Thus, the statute makes agreements to arbitrate "valid, irrevocable, and enforceable," 9 U.S.C. § 2, subject only to traditional principles of contract formation and interpretation. The FAA provides that contract provisions manifesting the intent of the parties to settle disputes in arbitration shall be binding, allows for the stay of federal court proceedings in any matter that is referable to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate. 9 U.S.C. §§ 2–4.

Cumulatively, those provisions "manifest a liberal federal policy favoring arbitration agreements." *Gilmer*, 500 U.S. at 24 (quotations omitted). Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

The Supreme Court has recently given new content to that strong federal pro-arbitration policy. It is not much of an exaggeration to say that the Court implied that the states were promulgating facially neutral rules that are in fact intended to discriminate against agreements to arbitrate vis-a-vis other contracts:

> The FAA . . . preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim." . . . . And not only that: The Act also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements.

*Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421 (2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011). Any consideration of State law, then, must bear in mind the *Kindred* preemption principle.

The fact remains, however, that arbitration is a creature of contract. Before referring any controversy to arbitration, the Court must determine whether the parties have indeed agreed to arbitrate it. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003). That determination has three subparts: (1) whether the parties agreed to arbitrate; (2) whether the dispute is within the scope of the agreement; and (3) whether Congress nevertheless intended the dispute to be non-arbitrable. *Sarbak v. Citigroup Global Markets, Inc.*, 354 F. Supp. 2d 531, 536–37 (D.N.J. 2004).

Because the parties point to no Congressional prohibition, only the first and second subparts are at issue here. As to the first, courts are to apply traditional principles of state contract law, while also keeping in mind "the strong federal policy in favor of arbitration." *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998). The second question is a matter of federal law. *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009).

### B. Discussion

Argun generally argues that Neiman Marcus's motion to compel arbitration should be denied because there exist genuine issues of material fact as to whether she knowingly and voluntarily signed an agreement to arbitrate disputes against her employer. (DE 11 at 1). Specifically, she claims that:

- She does not recall receiving the arbitration agreements from Neiman Marcus;
- Her signature on the acknowledgement forms manifested her acknowledgement that she received the employee handbook—not that she agreed to be bound by the arbitration provision;
- The employee handbook is a set of guidelines, not a binding contract;

12

- Although the signatures appear to be hers, she does not remember signing the arbitration agreements and was never presented with copies of the agreements during her twelve years at Neiman Marcus;
- Without examining the original document, she cannot determine whether her signature was electronically lifted from another document and placed on the agreement to make it appear as if she had signed the agreement;
- Although she signed the electronic documents as part of her training curriculum, the documents upon which Neiman Marcus relies in support of this motion do not contain her actual electronic signature;
- Neiman Marcus's evidence contains an acknowledgement for the employee handbook but not for the arbitration agreement; and
- None of the documents upon which Neiman Marcus relies contain her signature or her initials, and the documents merely represent acknowledgement of the associate handbook—not the arbitration agreement.

(DE 11-1 ¶ 1–19).

### 1. The agreement to arbitrate

During her employment at Neiman Marcus, Argun signed several forms that notified her of the arbitration requirement. Those acknowledgement forms also emphasized that her assent was a condition of employment. The record shows that the language was clear and that Argun had ample opportunity to review the terms of the agreement. Accordingly, as a matter of law, Argun voluntarily and knowingly agreed to arbitrate all disputes with Neiman Marcus.

To determine whether the parties have agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). New Jersey courts apply basic contract law principles, including offer, acceptance and consideration, to determine whether a valid arbitration agreement exists. *Martindale v. Sandvik, Inc.*, 173 NJ. 76, 87–88 (2002). There must be "an explicit, affirmative agreement that

unmistakably reflects the employee's assent" to arbitration. *Leodori v. CIGNA Corp.*, 175 N.J. 293, 303 (2003).

Argun signed two arbitration agreement acknowledgment forms during her time at Neiman Marcus. The first agreement was signed, in ink, on June 27 and July 17, 2007—less than a year after Argun began working there. The form noted that her assent was a term and condition of her employment. Argun continued working at Neiman Marcus.

Several years later, Neiman Marcus distributed physical copies of its revised arbitration agreement. The agreement was accompanied by a memorandum that detailed changes to the agreement and instructed employees how to sign the updated acknowledgement form on NMGPS. The memorandum specified that an employee's acknowledgment of the 2013 arbitration agreement, as with the 2007 agreement, was a term and condition of continued employment. Again, Argun continued working at Neiman Marcus.

After the 2013 agreement was distributed, Argun accessed NMGPS with a unique ID and a self-selected password and completed the curriculum. She acknowledged receipt of the revised arbitration agreement by a contemporaneous electronic signature.[6] The acknowledgement form required Argun to affirm that she (1) had received and reviewed the arbitration agreement, (2) accepted that arbitration was the exclusive means of resolving disputes with Neiman Marcus, "in lieu of a judge or jury trial," and (3) accepted the arbitration agreement by continuing to work for Neiman Marcus. Moreover, the acknowledgment icon specifically read "Click here to acknowledge receipt of The Neiman Marcus Group, Inc. Mandatory Arbitration."

---

[6] Both federal and state law recognize that that electronic signatures stand on equal legal footing with their physical counterparts. *See* 15 U.S.C. 7001 (a)(1) ("[A] signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form . . . ."); N.J. Stat. § 12A:12-7(a) ("A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.").

Argun also acknowledged, by signing three separate employee handbooks, that she was bound by the arbitration agreement. Finally, she voluntarily remained in her position at Neiman Marcus for over five years after the 2013 agreement was delivered to her. That contract, and the 2007 edition, specifically noted that in addition to her signature, continued employment demonstrated her assent to the terms of the agreement.

Accordingly, all the evidence of record signifies that Neiman Marcus apprised Argun that she was surrendering her rights to litigate disputes and that Argun knowingly accepted those terms as a condition of employment.

Argun's response consists chiefly of her objection that she does not remember receiving or signing the arbitration agreements. She also half-suggests, without actually saying so, that Neiman Marcus forged her physical signature on the 2007 acknowledgement form:

> 12. Further, while the signatures appear to me mine, I do not recall signing any standalone arbitration agreement, nor was I ever presented with a copy of an arbitration agreement during my 12 years with Neiman Marcus.
>
> 13. During my employment with Neiman Marcus, there were rumors that store managers and Human resources managers were forging employees signatures on documents without their knowledge.
>
> 14. Without examining the actual original document and my actual original signature, including retaining a handwriting expert to determine the validity of the signature, I cannot determine whether my signature was electronically lifted from another document and placed on the alleged arbitration to make it appear that I signed it.

(DE 11-1 ¶¶ 12–14). These arguments are without merit.

Argun claims that her lack of memory creates an issue of material fact as to whether she knowingly and voluntarily signed gave up her right to a jury trial. With respect to contractual disputes, federal courts have consistently held that a party's claimed failure to recall is insufficient to raise an issue as to contract formation. *See Batiste v. Island Records, Inc.*, 179 F.3d 217, 223 (5th Cir. 1999) (plaintiff's inability to remember signing contracts is insufficient to

15

raise a material issue as to validity of the agreement); *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt, Inc.*, 182 F.3d 51, 55 (1st Cir. 1999) (plaintiffs' failure to remember receiving document not a specific fact to defeat summary judgment); *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983) (inability to recall is a "mere possibility" of a fact dispute and is insufficient basis to deny a motion for summary judgment).

There is no forthright denial by Argun that she signed these documents, and she offers no explanation of how they came to be signed, both physically and by use of a self-selected password, if not by her. Accordingly, Argun has not created an issue of fact with respect to whether she signed the agreements.

Argun also argues that she may not have signed the 2013 agreement because Neiman Marcus's evidence contains only electronic signature, and not a handwritten one. However, "an actual, handwritten signature is not necessary" and "a party may manifest assent to a contract by clicking a link on a website." *Forsyth v. First Trenton Indem. Co.*, No. L-9185-08, 2010 N.J. Super. Unpub. LEXIS 1183, 2010 WL 2195996 at *6–7 (App. Div. May 28, 2010); *Caspi v. Microsoft Network, L.L.C.*, 323 N.J. Super. 118 (App. Div. 1999) (finding that a plaintiff accepted an online membership agreement, which contained a forum selection clause, where the agreement "appear[ed] on the computer screen in a scrollable window next to blocks providing the choices 'I Agree' and 'I Don't Agree.'"). The fact that this was an electronic rather than a physical signature does not create a genuine dispute of fact as to whether Argun signed the agreement. *See Ricci v. Sears Holding Corp.*, No. 14-3136, 2015 U.S. Dist. LEXIS 7617 at *4 (D.N.J. Jan. 23, 2015).

Argun also that she was never properly apprised of her waiver of the right to a jury trial. It is true that waivers of the right to a jury trial must be clear and unambiguous. *See Hemberger v. E*Trade Fin. Corp.*, No. 7-1621, 2007 U.S. Dist. LEXIS 85702 at *3–5 (D.N.J. Nov. 19, 2007), subject to the overarching principle that a state may not disfavor arbitration agreements vis-à-vis other contracts. *See Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 236

N.J. 301, 313, 199 A.3d 766, 773 (2019) (citing *Kindred Nursing Ctrs. L.P. v. Clark*, 581 U.S. ——, 137 S. Ct. 1421 (2017)).

The waivers in both the 2007 and 2013 agreements here, however, are phrased clearly and are variously, capitalized, bolded, and underlined to draw the reader's attention. "It will not do for a [person] to enter into a contract, and, when called upon to respond to its obligations, to say that [she] did not read it when [she] signed it, or did not know what it contained." *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008) (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875)); *see also Sheet Metal Workers Int'l. Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 673 F. Supp. 2d 313, 328 (D.N.J. 2009) ("Walking blindfolded through one's business affairs does not excuse the ensuing collision."). Courts excuse a party's failure to comprehend a contract's terms in rare cases only. *See, e.g., Morales*, 541 F.3d at 222 ("In the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English language is immaterial to whether an English-language agreement the offeree executes is enforceable.").

Here, Argun essentially asks for an exception to the usual rules of contract formation based on a general statement that she did not understand the contract. Argun signed the 2007 and 2013 arbitration agreements. It was her obligation to ensure that she understood the implications of the agreement before signing it. *See, e.g., Morales*, 541 F. 3d at 223. Accordingly, Neiman Marcus has met its burden of demonstrating that the parties formed an agreement to arbitrate.[7]

---

[7] The parties dispute the applicability of *Skuse v. Pfizer, Inc.*, 457 N.J. Super. 539 (App. Div.), *cert. granted*, 238 N.J. 374 (2019). In *Skuse*, the New Jersey Superior Court, Appellate Division found invalid an arbitration agreement that Argun likens to the one Neiman Marcus presented her. That case is too dissimilar, however, to affect the outcome of this one. Pfizer, unlike Neiman Marcus, presented its policy via summary slides and merely provided an external link through which employees could access the full policy. *Id.* at 558. Moreover, employees were required merely to "[click here] to acknowledge" receipt of the policy. *Id.* at 548 (emphasis added). *Skuse* has been distinguished by subsequent case law. *See Stowell v. Cantor Fitzgerald & Co.*, No. A-3010-18T3, 2020 WL 949043, at *8 (N.J. Super. Ct. App. Div. Feb. 27, 2020) (noting

## 2. The scope of the agreement

Argun does not offer any substantial argument that her dispute with Neiman Marcus does not fall within the scope of the arbitration agreement.

The determination of whether "a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law," "once a court has found that there is a valid agreement to arbitrate, regardless of whether the action is in a federal or a state court." *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003) (internal citations and quotation marks omitted); *see also Gay v. CreditInform*, 511 F.3d 369, 388 (3d Cir. 2007); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178–79 (3d Cir. 1999). To determine whether the particular dispute falls within the scope of a valid arbitration agreement, "there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotation marks and citations omitted); *see also USW, AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 331 (3d Cir. 2008).

In this case, Argun's allegations arise directly from her employment with Neiman Marcus. They are subject to arbitration, because the agreements she signed unambiguously state that "[t]he parties agree that all Disputes shall be

---

that the agreement, unlike that in *Skuse*, did not permit the viewer to simply click the box without exposing herself to the text of the agreement, and that it required acknowledgement that the person read and accepted the terms). *Skuse* is also on review by the Supreme Court of New Jersey, which has granted certification. 238 N.J. 374 (2019).

Neiman Marcus obtained its employees' consent to arbitrate by a process far more robust than the one in *Skuse*. Neiman provided physical copies of both the 2007 and 2013 agreements and distributed memoranda detailing their contents. It also secured assent through physical (2007) and electronic (2013) signatures. The mandatory nature of the arbitration agreement for all employees is repeatedly emphasized. Neiman Marcus's procedures, on their face, make it sufficiently clear to employees that they are binding themselves to the terms of the arbitration agreement.

resolved exclusively through binding arbitration in accordance with the terms, conditions, and procedures" of agreement. The agreement explicitly encompasses "claims related to, or arising out of, the employment relationship between Employee and NMG." It also specifically addresses disputes involving "an allegation that any adverse employment action was based on discrimination or harassment because of Employee's . . . disability, mental or physical handicap . . . or any other legally protected status arising under any federal, state or local law or regulation;" and "claims related to, or arising out of, the employment relationship between Employee and NMG; and/or Employee's separation from employment with NMG, including but not limited to any termination, retaliation or constructive discharge claims."

Argun's complaint consists of eight counts of workplace-related disputes that fall squarely within the agreement's ambit. In other words, the claims she alleges are precisely the type that she agreed to arbitrate of claims alleged in the Complaint.

## III. CONCLUSION

For the reasons set forth above, the motion to compel arbitration is **GRANTED**. All claims will be referred to arbitration, and the action is otherwise stayed.

A separate order will issue.

Dated: March 16, 2020

Hon. Kevin McNulty
**United States District Judge**